**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

TIMOTHY LE, *on behalf of himself and others similarly situated*,

     *Plaintiff*,

*v.*

SITUSAMC HOLDINGS CORP.,

     *Defendant*.

No. 1:25-cv-10579

---

## CLASS ACTION COMPLAINT

Plaintiff Timothy Le, individually and on behalf of all others similarly situated ("Plaintiff"), brings this action against Defendant SitusAMC Holdings Corporation ("SitusAMC" or "Defendant") seeking monetary damages, restitution, and/or injunctive relief for the proposed Class, as defined below. Plaintiff makes the following allegations upon information and belief, the investigation of counsel, and personal knowledge or facts that are a matter of public record.

### INTRODUCTION

1.    Defendant SitusAMC is a provider of specialized technology, data, and advisory services supporting the origination, transaction, management, servicing, and valuation of real estate debt and equity across the commercial and residential real estate finance industry.[1] SitusAMC's services have been called the "necessary plumbing for the commercial and residential

---

[1] *See Who We Are*, SitusAMC, https://www.situsamc.com/about-us-who-we-are (last visited Dec. 12, 2025).

real estate market."[2] Defendant's clients include major U.S. banks and mortgage lenders such as JPMorgan Chase, Citigroup and Morgan Stanley.

2.    In the ordinary course of its business, Defendant collects and stores the sensitive personally identifiable information ("PII") of millions of consumers who are customers of Defendant's client banks.

3.    On November 22, 2025, Defendant announced that it had determined that certain information from its systems had been compromised in a data breach (the "Breach" or "Data Breach").[3]

4.    Press accounts of the Breach indicate that after receiving a security alert on November 12, 2025, Defendant concluded on November 15, 2025 that its client's data had been compromised, and began notifying its clients of the attack on November 16, 2025.[4]

5.    While the "scope, nature and extent" of the Breach is still uncertain, Defendant has admitted that "[c]ertain data relating to some of our clients' customers may . . . have been impacted."[5]

6.    In subsequent updates posted to its website on November 25, December 1, and December 9, Defendant reaffirmed that the extent of the impacted data is still unknown while

---

[2] Rob Copeland et al., *A Swath of Bank Customer Data Was Hacked. The F.B.I. Is Investigating*, N.Y. TIMES (Nov. 22, 2025), https://www.nytimes.com/2025/11/22/business/bank-data-hack.html.

[3] *Data Breach*, SitusAMC, https://www.situsamc.com/databreach (last visited Dec. 12, 2025).

[4] Bill Toulas, *Real-Estate Finances Services Giant SitusAMC Breach Exposes Client Data*, BLEEPINGCOMPUTER (Nov. 24, 2025), https://www.bleepingcomputer.com/news/security/real-estate-finance-services-giant-situsamc-breach-exposes-client-data/.

[5] *Data Breach*, SitusAMC, https://www.situsamc.com/databreach (last visited Dec. 12, 2025).

indicating that Defendant expects to "coordinate with impacted clients related to any consumer notifications that may be required."[6]

7.    On November 23, 2025, the *New York Times* reported that the FBI is in contact with groups affected by the cyberattack, including major American banks.[7] The article noted that while "[c]ybersecurity breaches are not uncommon in the business world," this Breach "has raised particular concern on Wall Street because SitusAMC holds a huge collection of personal data found on loan applications, including Social Security numbers."[8]

8.    Upon information and belief, customers are required to entrust Defendant with sensitive PII, without which Defendant could not perform its regular business activities. Defendant retains this information for many years and even after the company relationship has ended.

9.    By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiff and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

10.    Defendant failed to adequately protect Plaintiff's and Class Members' PII. This PII was compromised due to Defendant's negligent and/or careless acts and omissions and its failure to protect Plaintiff's and Class Members' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' PII because of its value in stealing and exploiting the identities of Plaintiff and Class Members. The present and continuing risk of identity theft and fraud to victims of the Data Breach will remain for their respective lifetimes.

---

[6] *Id.*; *Data Breach Past Updates*, SitusAMC, https://www.situsamc.com/data-breach-past-updates (last visited Dec. 12, 2025).
[7] Copeland et al., *supra* note 2.
[8] *Id.*

## PARTIES

**A.    Plaintiff**

11.    Plaintiff Timothy Le is a resident and citizen of the state of Illinois, residing in Cook County.

**B.    Defendant**

12.    Defendant SitusAMC Holdings Corporation is a Delaware corporation with its principal place of business at Tower 49, 12 East 49th Street, New York, New York County, New York 10017.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d), because this is a class action where the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant. Plaintiff is a citizen of the state of Illinois.

14.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in this District, it regularly conducts business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

15.    Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL ALLEGATIONS

16.    Defendant SitusAMC is the leading independent provider of specialized technology, data, advisory, and outsourcing solutions supporting the entire lifecycle of commercial

and residential real estate finance. Its services include mortgage origination, loan underwriting and servicing, asset management, and valuation of real estate debt and equity.[9]

17.     SitusAMC's clients include major U.S. banks and financial institutions, such as JPMorgan Chase, Citigroup, and Morgan Stanley. In the ordinary course of its business, SitusAMC manages billions of loan-related documents annually, requiring it to store and process extensive personal information, including financial account details, legal agreements, and Social Security numbers.[10] As a real estate executive who advises mortgage lenders told the *New York Times*, most of the top American banks that "make commercial real estate and residential loans . . . probably have a relationship with Situs."[11]

18.     At times and for reasons not presently known to Plaintiff, SitusAMC entered into contracts to provide services to JPMorgan Chase, Citigroup, and/or additional financial-institution clients. These contracts required SitusAMC to receive, store, and process sensitive customer information belonging to consumers like Plaintiff and Class Members.

19.     Plaintiff and Class Members are current and former customers of the financial-institution clients of SitusAMC, including but not limited to JPMorgan Chase and Citigroup. These financial institutions provided SitusAMC with customer information in connection with SitusAMC's contracted services.

20.     In the ordinary course of business, financial institutions such as JPMorgan Chase and Citigroup require their customers, including Plaintiff and Class Members, to provide them

---

[9] *See Who We Are*, SitusAMC, https://www.situsamc.com/about-us-who-we-are (last visited Dec. 12, 2025).

[10] Alicia Hope, *JPMorgan Chase, Citi, Morgan Stanley and Other Major US Banks Impacted by Data Breach at SitusAMC*, CPO MAG. (Dec. 1, 2025) https://www.cpomagazine.com/cyber-security/jpmorgan-chase-citi-morgan-stanley-and-other-major-us-banks-impacted-by-data-breach-at-situsamc/.

[11] Copeland et al., *supra* note 2.

with sensitive personal and financial information, including names, dates of birth, Social Security numbers, financial-account information, loan information, and other personally identifiable information.

21.     On information and belief, Defendant SitusAMC, in the course of performing services for its financial-institution clients, collected, stored, and maintained this PII on computer systems and networks under its control in the United States.

22.     Based on SitusAMC's contractual relationships with its financial-institution clients and the known sensitivity of the consumer information those clients entrusted to it, Defendant agreed to and undertook legal and contractual duties to maintain the confidentiality, integrity, and security of the PII. These duties included ensuring that SitusAMC's computer systems and data-handling practices complied with applicable federal and state laws, regulations, industry standards, and the reasonable expectations of its financial-institution clients and their customers.

**A.     The Data Breach**

23.     On November 22, 2025, Defendant announced that it became aware of the Data Breach on November 12, 2025.[12] This November 22, 2025 statement did not include: the identity of the cybercriminals who perpetrated this Data Breach, the details of the root cause of the Data Breach, the vulnerabilities exploited, or the remedial measures undertaken to ensure such a breach does not occur again.

24.     In subsequent updates over the following days, Defendant acknowledged it had identified that the data exposed in the Data Breach included "(i) SitusAMC corporate files that generally include legal contracts and accounting documents, (ii) files associated with our

---

[12] *Data Breach*, SitusAMC, https://www.situsamc.com/databreach (last visited Dec. 12, 2025).

residential Collateral and Asset Management (CAM) system, (iii) a smaller number of other records related to various businesses at SitusAMC, and (iv) records associated with loan file due diligence in our residential business."[13]

25.    On November 25, 2025, Defendant also posted a sample letter on its website directed to its institutional clients, not Plaintiff or Class Members.[14]

26.    As of the date of this Complaint, Defendant has failed to inform Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected, of critical facts that would enable them to mitigate any harms resulting from the Breach.

27.    Among the deficiencies in Defendant's disclosure, Defendant fails to state (1) how the Breach itself occurred and (2) what PII of Plaintiff and Class Members was impacted. All of this information is vital to victims of a data breach, let alone a data breach of this magnitude, due to the sensitivity and wide array of potentially compromised information, and its omission impedes Plaintiff and Class Members from mitigating any resultant harm.

28.    Moreover, Defendant has yet to state whether it undertook any efforts to contact the Class Members whose PII was accessed and acquired in the Data Breach, whether any of the Class Members have suffered misuse of their PII, whether Class Members should report its misuse to Defendant, and whether Defendant set up any mechanism for Class Members to report any misuse of their PII.

29.    On information and belief, Defendant failed to use reasonable security measures appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of PII.

---

[13] *Id.*
[14] *Id.*

30.     Plaintiff further believes that his PII and that of Class Members was likely subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyberattacks of this type.

31.     As a condition of receiving services from Defendant's financial institution clients, Plaintiff and Class Members were required to give their sensitive and confidential PII to Defendant and its clients.

32.     Defendant retains and stores this information and derives a substantial economic benefit from the PII that it collects. But for the collection of Plaintiff's and Class Members' PII, Defendant would be unable to provide certain of its services.

33.     Plaintiff and Class Members reasonably expected that Defendant would safeguard their highly sensitive information and keep it confidential.

34.     Due to the sensitivity of the PII that Defendant handles, Defendant is aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

35.     By obtaining, collecting, and storing Plaintiff's and Class Members' PII, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures. Defendant knew or should have known that it was responsible for protecting this PII from disclosure.

36.     Despite these duties, Defendant failed to implement reasonable data security measures to protect the information with which it was entrusted and ultimately allowed hackers to compromise Plaintiff's and Class Members' PII. Had Defendant properly secured the systems containing Plaintiff's and Class Members' PII, Defendant could have prevented the Data Breach.

**B.     Defendant Failed to Secure Plaintiff's and Class Members' Sensitive PII**

**1.     *Data Breaches Are Preventable***

37.     Defendant did not use reasonable security procedures and practices appropriate to the sensitive nature of the information it was maintaining for Plaintiff and Class Members.

38.     Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting its systems containing PII.

39.     As explained by the Federal Bureau of Investigation ("FBI"), "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[15]

40.     To prevent and detect cyberattacks and/or ransomware attacks, Defendant could and should have implemented the following measures, as recommended by the FBI:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

---

[15] FED. BUREAU OF INVESTIGATION, How to Protect Your Networks from Ransomware 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[16]

41. To prevent and detect cyberattacks and/or ransomware attacks, Defendant could and should have implemented the following measures, as recommended by the Microsoft Threat Protection Intelligence Team:

- **Secure internet-facing assets**

  o Apply latest security updates

  o Use threat and vulnerability management

  o Perform regular audit; remove privileged credentials;

- **Thoroughly investigate and remediate alerts**

  o Prioritize and treat commodity malware infections as potential full compromise;

---

[16] *Id*. at 3-4.

- **Include IT Pros in security discussions**

  o Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

- **Build credential hygiene**

  o Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

- **Apply principle of least-privilege**

  o Monitor for adversarial activities

  o Hunt for brute force attempts

  o Monitor for cleanup of Event Logs

  o Analyze logon events;

- **Harden infrastructure**

  o Use Windows Defender Firewall

  o Enable tamper protection

  o Enable cloud-delivered protection

  o Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[17]

42.    Given that Defendant was storing the PII of its clients' current and former customers, Defendant could and should have implemented all of the above measures to detect and prevent cyberattacks.

43.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach in which data thieves acquired and accessed the PII of Plaintiff and Class Members.

---

[17] *See* MICROSOFT THREAT INTEL., *Human-Operated Ransomware Attacks: A Preventable Disaster* (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/.

2.  ***Defendant Acquires, Collects, and Stores the PII of Its Clients' Current and Former Customers***

44.    Defendant acquires, collects, and stores a massive amount of PII of its clients' current and former customers.

45.    Defendant collects and stores such highly sensitive personal information, such as Plaintiff's and Class Members' PII, in the normal course of its business.

46.    By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

47.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted their PII to Defendant absent a duty to safeguard that information.

48.    Plaintiff and Class Members relied on Defendant to keep their PII confidential and securely maintained; to use this information for business purposes only; and to make only authorized disclosures of this information.

3.  ***Defendant Knew, or Should Have Known, of the Significant Risk of a Data Breach***

49.    Data breaches have become widespread. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims.[18] The estimated number of organizations impacted by data compromises has increased by more than 2,600 percentage points since 2018, and the estimated number of victims has increased by more

---

[18] Identity Theft Res. Ctr., *Identity Theft Resource Center 2023 Annual Data Breach Report Reveals Record Number of Compromises* (Jan. 25, 2024), https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/.

than 1,400 percentage points.[19] The 3,205 compromises in 2023 represent a 78% increase over the previous year and a 72% increase over the previous all-time high for compromises in a single year (1,860), set in 2021.[20] In 2024, the number of data compromises remained at this elevated level, with a 211% increase in victim notices from the prior year.[21]

50.    In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the PII it collected and maintained would be targeted by cybercriminals.

51.    Additionally, as companies have become more dependent on computer systems to run their businesses,[22] *e.g.*, due to employees working remotely, the danger posed by cybercriminals has been magnified, highlighting the need for adequate administrative, physical, and technical safeguards.[23]

52.    Defendant knew and understood that PII in the custody of companies in the financial services industry is particularly valuable and highly sought after by cybercriminals seeking to illegally monetize that PII through unauthorized access.

---

[19] *Id.*

[20] *Id.*

[21] Identity Theft Res. Ctr., *Identity Theft Resource Center's 2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices* (Jan. 28, 2025), https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/.

[22] Danny Brando, et al., *Implications of Cyber Risk for Financial Stability*, FEDS NOTES (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[23] Suleyman Ozarslan, *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUSLABS (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

53.     At all relevant times, Defendant knew, or reasonably should have known, the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences of a breach of Defendant's data security systems, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of such a breach. Still, Defendant failed to undertake adequate cybersecurity measures to prevent the Data Breach.

54.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records to mitigate the harms and risks caused by the Breach. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to damages due to any fraudulent use of their PII.

55.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement and/or maintain adequate data security measures to protect the PII of Plaintiff and Class Members.

56.     The effects of Defendant's failure to secure the PII of Plaintiff and Class Members are long-lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and resulting damage to victims may continue for years.

### 4.     *The PII of Plaintiff and Class Members Exposed in the Breach Is Highly Sensitive*

57.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[24] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's

---

[24] 17 C.F.R. § 248.201 (2013).

license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[25]

58.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[26] For example, PII can be sold at a price ranging from $40 to $200.[27]

59.    Because Social Security numbers are difficult to change and enable cybercriminals to commit numerous forms of devastating identity theft, they are among the most sensitive forms of PII.

60.    A stolen Social Security number can be used alone or in combination with other sources of PII to wreak havoc upon a victim's personal and financial life. The popular personal privacy and credit monitoring service LifeLock by Norton notes that stolen Social Security numbers can be used by used by cybercriminals to, among other things, (1) "[o]pen bank accounts and credit cards in your name," (2) "[d]rain your bank account," (3) "[r]ent apartments or vehicles," (4) "[m]ake fraudulent purchases," (5) "[g]et a fake ID or driver's license," (6) "[f]ile a tax return," (7) "[s]teal your medical benefits and social security checks," and (8) "[c]ommit crimes on your record."[28]

---

[25] *Id.*

[26] Anita George, *Your Personal Data is for Sale on the Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[27] Ben Luthi, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[28] Emily Lockwood, *What Can Someone Do with Your Social Security Number?*, LIFELOCK (Oct. 11, 2024), https://lifelock.norton.com/learn/identity-theft-resources/what-can-someone-do-with-your-social-security-number.

61.     Courts have dubbed a stolen Social Security number the "gold standard" for identity theft and fraud. Social Security numbers are among the worst kind of PII to have stolen because they can be put to a variety of fraudulent uses and are difficult for an individual to change.

62.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[29] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[30]

63.     The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> Scammers use your Social Security number (SSN) to get other personal information about you. They can use your SSN and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your SSN until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.[31]

64.     In fact, a "stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[32] "Someone who has your SSN can use it to

---

[29] Soc. Sec. Admin., *Avoid Identity Theft: Protect Social Security Numbers*, https://www.ssa.gov/phila/ProtectingSSNs.htm.

[30] *Id.*

[31] Soc. Sec. Admin., *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf.

[32] Equifax, *How to Protect Yourself from Social Security Number Identity Theft*, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/.

impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[33]

65.     Despite these severe risks, Social Security numbers can only be changed in "extreme cases," after a "lengthy and difficult process," in which the applicant must prove that their "identity is being misused and that the misuse is causing significant damage."[34] In other words, preventative action to defend against the expected imminent misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

66.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[35]

67.     For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), *report and recommendation adopted*, No. 3:17-CV-30111, 2020 WL 877035

---

[33] Julia Kagan, *What Is an SSN? What to Know About Social Security Numbers*, INVESTOPEDIA (Sept. 2, 2024), https://www.investopedia.com/terms/s/ssn.asp.

[34] Emily Lockwood, *What Can Someone Do with Your Social Security Number?*, LIFELOCK (Oct. 11, 2024), https://lifelock.norton.com/learn/identity-theft-resources/what-can-someone-do-with-your-social-security-number.

[35] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

(D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (S.D.N.Y. Mar. 8, 2021) ("Social Security numbers [are] arguably 'the most dangerous type of personal information in the hands of identity thieves' because [they are] immutable and can be used to 'impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment.' . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, '[a] social security number derives its value in that it is immutable,' and when it is stolen it can 'forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.'").

68.    The information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. Some of the information potentially compromised in the Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, birth dates, and names.

69.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[36]

70.    Among other forms of fraud, identity thieves may use PII to obtain driver's licenses, government benefits, medical services, and housing, or even give false information to police.

71.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, as well as

---

[36] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

a time lag between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[37]

72.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records. The Class is incurring, and will continue to incur, such damages in addition to damages due to any fraudulent use of their PII.

### 5.     *Defendant Failed to Comply with FTC Guidelines*

73.     The FTC has promulgated numerous guides for businesses highlighting the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

74.     In 2016, the FTC updated its publication, "Protecting Personal Information: A Guide for Business," which established cybersecurity guidelines for businesses. These guidelines note that businesses should protect the personal consumer information they keep; properly dispose of personal information that is no longer needed; encrypt information stored on their computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[38]

---

[37] U.S. Gov't Accountability Off., GAO-07-737, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf [hereinafter GAO Report].

[38] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016), available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

75.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[39]

76.     The FTC further recommends that companies not maintain PII longer than needed; limit access to sensitive data; require complex passwords on their network; use industry-tested methods for security; monitor for suspicious activity on their network; and verify that third-party service providers have implemented reasonable security measures.

77.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating their failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45. The FTC's orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

78.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, a business's unfair act or practice of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

79.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of its customers and/or its clients' customers or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[39] *Id.*

80.     Upon information and belief, Defendant was at all times fully aware of its obligations to protect the PII of its customers and/or its clients' customers. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense harm that would result to Plaintiff and Class Members.

### 6.     *Defendant Failed to Comply with Industry Standards*

81.     Several best practices have been identified that, at a minimum, should be implemented by financial services companies, like Defendant, in possession of PII, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data.

82.     Other cybersecurity best practices that are standard for financial services companies and companies entrusted with such data include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

83.     Defendant failed to meet the minimum standards of one or more of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls ("CIS CSC"), which are all established standards in reasonable cybersecurity readiness.

84.    These foregoing frameworks are existing and applicable industry standards for financial services companies and companies entrusted with such data, and upon information and belief, Defendant failed to comply with one or more of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

**C.    Plaintiff and the Class Members Suffered and Will Continue to Suffer Common Injuries and Damages**

85.    As a result of Defendant's ineffective and inadequate data security practices, Plaintiff and Class Members have sustained actual injuries, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of their PII; (iv) loss of the benefit of the bargain; (v) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) nominal damages; and (vii) a continued and increased risk to their PII, which remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

**1.    *The Data Breach Increases Plaintiff's and Class Members' Risk of Identity Theft***

86.    The unencrypted PII of Class Members is now in the hands of undisclosed cybercriminals and will likely end up for sale on the dark web because that is the *modus operandi* of hackers.

87.    Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access Plaintiff's and Class Members' PII.

88.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

89.    Plaintiff's and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

90.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity after the initial account setup."[40] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account."[41]

91.    Additionally, criminals will frequently piece together bits and pieces of compromised PII for profit through the development of "Fullz" packages. Fullz" are packages of various PII for a victim, which may include, among other things, the victim's name, address, credit card information, Social Security number, date of birth, and more.

92.    "As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous

---

[40] Ann Carns, *Just 5 Banks Prohibit Use of Social Security Numbers*, N.Y. TIMES (Mar. 20, 2013), https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/.

[41] CREDIT.COM, *What Can Someone Do With Your Social Security Number?*, https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge.[42]

93.    With "Fullz" packages, cybercriminals can cross-reference two sources of PII to marry data available elsewhere with criminally stolen data with an astonishingly complete scope and degree of accuracy, allowing them to assemble complete dossiers on individuals.

94.    The practice of developing "Fullz" packages means that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) many times.

### 2.    *Plaintiff and Class Members Suffered Injury from the Loss of Time to Mitigate the Risk of Identity Theft and Fraud*

95.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach, monitoring accounts for fraudulent activity, and signing up for credit monitoring insurance services. Accordingly, the Data Breach has caused Plaintiff and Class Members to suffer actual injury in the form of lost time—which cannot be recaptured—spent on mitigation activities.

---

[42] *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/.

96.     Plaintiff's mitigation efforts are consistent with the GAO's 2007 conclusion that victims of identity theft from data breaches will face "substantial costs and time to repair the damage to their good name and credit record."[43]

97.     Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert, reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[44]

### 3.     *The Value of Plaintiff's and Class Members' PII Was Diminished as a Result of the Breach*

98.     PII is a valuable property right. Corporate America generates tremendous revenue from the collection and sale of such data. And PII is sold and distributed on the dark web and through illicit criminal networks at specific, identifiable prices.

99.     Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[45]

100.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[46]

---

[43] GAO Report at 2.

[44] *See* FED. TRADE COMM'N, IdentityTheft.gov, https://www.identitytheft.gov/Steps.

[45] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/.

[46] David Lazarus, *Shadowy Data Brokers Make the Most of Their Invisibility Cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

101.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[47]

102.    For instance, consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[48]

103.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### 4.    *The Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary*

104.    Given the type of targeted, sophisticated attack in this case and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market or dark web for sale and purchase by criminals intending to utilize the PII for identity-theft crimes, such as opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

105.    Such fraud may go undetected until debt collection calls begin months, or even years, later. An individual may not know their PII was used to file for unemployment benefits until

---

[47] Datacoup, https://datacoup.com/.

[48] NIELSEN, Join Our Nielsen Panel and Get Rewarded, https://computermobilepanel.nielsen.com/ui/US/en/sdp/landing.

law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

106.    Moreover, Social Security numbers can only be changed *after* the occurrence of identity theft or fraud, preventing Plaintiff and Class Members from effectively shielding themselves from future identity theft or fraud caused by the Breach.

107.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

108.    The retail cost of credit monitoring and identity theft monitoring can be around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

### 5.    *Plaintiff and Class Members Lost the Benefit of Their Bargain*

109.    Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant's clients for products or services that required disclosing their PII, Plaintiff, Class Members, and other reasonable consumers understood and expected that they were, in part, paying for necessary data security to protect their PII. Because Defendant did not, in fact, provide that expected data security, Plaintiff and Class Members received products or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's clients and their implied bargain with Defendant.

### 6.    *Plaintiff's Experience*

110.    Plaintiff is a customer of JPMorgan Chase, one of the financial institutions that provided data to SitusAMC and was impacted by the Breach.

111.    Through his relationship with JPMorgan Chase, Plaintiff provided sensitive PII to Defendant in connection with Defendant's provision of its services. On information and belief, Defendant retained Plaintiff's PII in its systems at the time of the Breach.

112.    Plaintiff has taken reasonable steps to maintain the confidentiality of his PII and would not have entrusted his PII to Defendant through Defendant's client, JPMorgan Chase, had he known that Defendant would fail to maintain adequate data security to protect his PII.

113.    Plaintiff provided his PII to Defendant through Defendant's client JPMorgan Chase on the understanding that they would use reasonable measures to protect his sensitive PII.

114.    Plaintiff has made and continues to make reasonable efforts to mitigate the impact of the Breach, including but not limited to monitoring his financial accounts for signs of fraud. Plaintiff anticipates spending considerable time and money on an ongoing basis to mitigate and address harms caused by the Breach.

115.    As a result of the Breach, Plaintiff is and will be at increased risk of fraud and identity theft for years to come.

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action on behalf of himself and all others similarly situated ("Class Members"). Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2) and 23(b)(3), 23(c)(4), and/or 23(c)(5) as applicable, Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All natural persons residing in the United States whose Personally Identifiable Information was compromised as a result of the Data Breach.

117.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

118.    Plaintiff reserves the right to modify or amend the definition of the proposed class or add Classes or Subclasses if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

119.    **Numerosity under Federal Rule of Civil Procedure 23(a)(1)**. While the exact scope of the Breach has not been disclosed by Defendant, given the Defendant's role as the leading service provider in the real estate equity and debt markets, the number of individuals impacted by the Breach is likely very high. Thus, members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable.

120.    **Commonality under Federal Rule of Civil Procedure 23(a)(2).** There are questions of law and fact common to Plaintiff and Class Members, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a) Whether Defendant unlawfully used, maintained, or disclosed Plaintiff's and the Class Members' PII;

b) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

c) Whether Defendant truthfully represented the nature of its security systems, including its vulnerability to hackers;

d) Whether Defendant's data security protocols prior to and during the Data Breach complied with applicable data security laws and regulations;

e) Whether Defendant's data security protocols prior to and during the Data Breach were consistent with industry standards;

f) Whether Defendant owed a duty to Class Members to safeguard their PII;

g) Whether Defendant owed a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

h) Whether Defendant owed a duty not to use the PII of Plaintiff and Class Members for non-business purposes;

i) Whether Defendant breached its duty to Class Members to safeguard their PII;

j) Whether Defendant breached its duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

k) Whether Defendant breached its duty not to use the PII of Plaintiff and Class Members for non-business purposes;

l) Whether cybercriminals obtained, sold, copied, stored or released Class Members' PII;

m) Whether Defendant knew or should have known that its data security programs and monitoring processes were deficient;

n) When Defendant actually learned of the Data Breach;

o) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII was compromised;

p) Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

q) Whether Defendant violated the law by failing to adequately, promptly, and accurately inform Plaintiff and Class Members that their PII was compromised;

r) Whether Class Members suffered legally cognizable damages as a result of Defendant's misconduct; and

s) Whether Plaintiff and Class Members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

121. **Typicality under Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of those of the Class Members because Plaintiff's PII, like that of every Class Member, was compromised in the Data Breach.

122.   **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(4).**

Plaintiff will fairly and adequately represent and protect the interests of Class Members, including those from states and jurisdictions where they may not reside. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff's counsel are competent and experienced in litigating complex class actions and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

123.   **Predominance under Federal Rule of Civil Procedure 23(b)(3).** Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all Plaintiff's and the Class Members' data at issue here was stored by Defendant and was accessed during the Data Breach. The common issues arising from Defendant's respective conduct affecting Class Members, as described *supra*, predominate over any individualized issues. Adjudication of the common issues in a single action has important and desirable advantages of judicial economy.

124.   **Superiority under Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members could find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

125. <u>**Injunctive Relief is Appropriate under Federal Rule of Civil Procedure**</u> <u>**23(b)(2).**</u> Defendant failed to take actions to safeguard Plaintiff's and Class Members' PII such that injunctive relief is appropriate and necessary. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CLAIMS FOR RELIEF

### <u>CLAIM I - Negligence</u>
**(On Behalf of Plaintiff and the Class)**

126. Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 125 as if fully set forth herein.

127. Defendant knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

128. Defendant knew or should have known of the risks inherent in collecting the PII of Plaintiff and Class Members and the importance of adequate security. Defendant was on notice because, on information and belief, it knew or should have known that it would be an attractive target for cyberattacks.

129. Defendant owed a duty of care to Plaintiff and Class Members whose PII was entrusted to it. Defendant's duties included, but were not limited to, the following:

    A.    To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII in its possession;

    B.    To protect customers' PII using reasonable and adequate security procedures and systems compliant with industry standards;

    C.    To have procedures in place to prevent the loss or unauthorized dissemination of PII in its possession;

D.    To employ reasonable security measures and otherwise protect the PII of Plaintiff and Class Members pursuant to the FTCA and applicable industry standards;

E.    To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

F.    To precisely disclose the type(s) of information compromised.

130.    Defendant's duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

131.    Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting PII in its possession to protect it from being compromised, stolen, or misused by unauthorized persons.

132.    Specifically, this duty included, among other things: (a) implementing industry standard data security safeguards to protect the PII of Plaintiff and Class Members such as MFA, rotating credentials, and restricting access privileges; (b) maintaining, testing, and monitoring Defendant's security systems to ensure that PII was adequately secured and protected; (c) timely acting upon warnings and alerts to respond to intrusions; and (d) adequately notifying Plaintiff and Class Members about the types of data that were compromised in the Data Breach.

133.    Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Defendant collected and stored valuable PII that is routinely targeted by cybercriminals. Plaintiff and Class Members were the foreseeable and probable victims of any compromise due to Defendant's inadequate data security practices. Defendant owed Plaintiff and Class Members a duty of care not to subject them to an unreasonable risk of harm.

134.    Defendant had a special relationship with its clients' current and former customers, including Plaintiff and Class Members.

135.    Plaintiff's and Class Members' willingness to entrust Defendant with their PII was predicated on the understanding that Defendant would take adequate security precautions to protect it. Moreover, only Defendant had the ability to protect its systems (and the PII stored thereon) from attack.

136.    Defendant breached the duties owed to Plaintiff and Class Members and was thus negligent. Although the exact methodologies employed by the unauthorized third parties are yet to be disclosed by Defendant, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the data breach to occur: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security programs in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its customers; (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII; and (i) failing to timely patch known vulnerabilities to its computer systems or networks.

137.    Defendant's duty also arose because it was bound by industry standards to protect its current and former customers' confidential PII.

138.    Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendant.

139.    Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII within its possession.

140.    Defendant, by its actions and/or omissions, breached its duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

141.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

A.    Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII;

B.    Failing to adequately monitor the security of its networks and systems;

C.    Allowing unauthorized access to Plaintiff's and Class Members' PII;

D.    Failing to comply with the FTCA and applicable industry standards;

E.    Failing to detect in a timely manner that Plaintiff's and Class Members' PII had been compromised; and

F.    Failing to timely notify Plaintiff and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

142.    Defendant's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' PII to be compromised and exfiltrated, as alleged herein.

143.    Defendant's breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their PII, and/or loss of time and money to monitor their accounts for fraud.

144.    As a result of Defendant's breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their PII, which is still in the possession of criminal third parties, has been and will continue to be used for fraudulent purposes.

145.    Defendant also had independent duties under state laws that required it to reasonably safeguard Plaintiff's and Class Members' PII.

146.    Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

147.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

148.    Defendant's violation of Section 5 of the FTC Act is *prima facie* evidence of its negligence.

149.    Plaintiff and the Class are within the class of persons that the FTC Act was intended to protect.

150.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of its failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

151.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the damages to and diminution in the value of their PII; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports, purchasing credit monitoring and/or identity protection; (vii) the imminent and impending risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect it; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and the Class.

152.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

153.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long

as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

154.    In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *inter alia*, strengthen its data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

155.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including actual, consequential, and nominal damages.

## CLAIM II – Breach of Implied Contract
### (On behalf of Plaintiff and the Class)

156.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 155 as if fully set forth herein.

157.    As a condition of using Defendant's services or the services of Defendant's clients, Defendant and/or Defendant's clients required Plaintiff and Class Members to provide their PII.

158.    By mandating that Plaintiff and Class Members provide their PII as a condition of use, Defendant implied an assent to safeguard and protect their PII.

159.    In its Privacy Policy, Defendant represented that it (i) implemented measures to help ensure an appropriate level of security for the PII and (ii) would not retain customer PII longer than necessary.

160.    Plaintiff and Class Members would not have provided their PII to Defendant and/or Defendant's clients had they known that Defendant would not safeguard their PII.

161.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

162.    Defendant breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their personal information, failing to delete the information of Plaintiff and the Class once the relationship ended, and failing to provide timely and accurate notice to them that their PII was compromised as a result of the Data Breach.

163.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

164.    As a direct and proximate result of the Defendant's breach of implied contract, Plaintiff and Class Members are entitled to damages, including actual damages, compensatory damages, and/or nominal damages, in an amount to be proven at trial.

### CLAIM III – Unjust Enrichment / Quasi-Contract for Restitution
### (On Behalf of Plaintiff and the Class)

165.    Plaintiff repeats and realleges the factual allegations contained in paragraphs 1 through 164 as if fully set forth herein.

166.    This claim is brought in the alternative to breach of implied contract.

167.    Plaintiff and the Class conferred a direct or indirect monetary benefit on Defendant in the form of fees paid to Defendant and/or Defendant's clients for services. Part of these services

required Defendant to safeguard the PII entrusted to them by Plaintiff and the Class for these services.

168.    Defendant knowingly received, accepted, and appreciated the benefits conferred upon it by Plaintiff and the Class, including the benefit of the PII it received from Plaintiff and the Class for which it profited during the course of its business.

169.    Under principles of equity and good conscience, it would be unjust and unfair for Defendant to retain money belonging to Plaintiff and the Class because Defendant failed to (i) implement data management and security measures mandated by FTC guidelines, (ii) dispose of PII that was no longer needed or required, and (iii) timely and accurately inform Plaintiff and the Class of the Data Breach.

170.    As a result of Defendant's conduct, Plaintiff and the Class suffered damages in the amount of the difference between the price they paid for Defendant's services as promised and the actually diminished value of Defendant's clients' services and the costs of future monitoring of their credit history for identity theft and fraud.

171.    Plaintiff, on behalf of themselves and the other members of the Class, seek disgorgement of the money that Defendant unjustly received plus prejudgment interest, and costs.

### CLAIM IV – Declaratory Judgment
**(28 U.S.C. § 2201)**
**(On Behalf of Plaintiff and the Class)**

172.    Plaintiff repeats and reallege the factual allegations contained in paragraphs 1 through 171 as if fully set forth herein.

173.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

174.    Defendant owes a duty of care to Plaintiff and Class Members, which required Defendant to adequately monitor and safeguard Plaintiff's and Class Members' PII.

175.    Defendant and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII belonging to Plaintiff and Class Members.

176.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the exposure of their PII. The risk remains that further compromises of their private information will occur in the future.

177.    Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a)  Defendant owes a legal duty to secure the PII of Plaintiff and the Class within its care, custody, and control under the common law, and Section 5 of FTC Act;

    b)  Defendant breached its duty to Plaintiff and the Class by allowing the Data Breach to occur;

    c)  Defendant's existing data monitoring measures do not comply with its obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII of Plaintiff and the Class within Defendant's custody, care, and control; and

    d)  Defendant's ongoing breaches of its duties continue to cause harm to Plaintiff and the Class.

178.    This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect the PII of Plaintiff and the Class within its custody, care, and control, including the following:

    a)  Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

    b)  Order that, to comply with Defendant's obligations and duties of care, Defendant must implement and maintain reasonable security and monitoring measures, including, but not limited to:

        i.  Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems, networks, and servers on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

        ii.  Encrypting and anonymizing the existing PII within its servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendant to provide adequate services;

        iii.  Engaging third-party security auditors and internal personnel to run automated security monitoring;

        iv.  Auditing, testing, and training its security personnel regarding any new or modified procedures;

        v.  Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems, networks, and servers;

        vi.  Conducting regular database scanning and security checks; and

        vii.  Routinely and continually conducting internal training and education to inform Defendant's internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

179.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiff and the Class will not have an adequate remedy at law because monetary relief

alone will not compensate Plaintiff and the Class for the serious risks of future harm. Moreover, Plaintiff and the Class are unable to stop using Defendant's services without experiencing undue hardship. Because providing information to Defendant is a precondition for receiving real estate and related banking services, Plaintiff cannot cease providing this information. This would be an extreme financial hardship to Plaintiff and Class Members.

180.    The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial, continued identity theft and other related damages and/or additional data breaches and exposure if an injunction is not issued. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a preexisting legal obligation to employ such measures.

181.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent or larger data breach or cybersecurity incident, thus preventing future injury to Plaintiff and the Class and other persons whose PII would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests the following relief:

A. An Order certifying the Class and their counsel to represent the Class;

B. Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse of and/or disclosure of the PII of Plaintiff and Class Members; and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members; and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members.

C.  Injunctive relief, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

    a)  Prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    b)  Requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws; requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

    c)  Requiring Defendant to delete, destroy, and purge the PII of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    d)  Requiring Defendant to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of PII of Plaintiff and Class Members;

    e)  Requiring Defendant to engage independent third-party security personnel regarding any new or modified procedures requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    f)  Requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

    g)  Requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

    h)  Requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

    i)  Requiring Defendant to conduct regular database scanning and securing checks;

j) Requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

k) Requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

l) Requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

m) Requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

n) Requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

o) Requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. Injunctive relief, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

E. For an award of damages, including actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

F.  For an award of attorneys' fees, costs, and litigation expenses, as allowed by law; and

G.  For prejudgment and postjudgment interest on all amounts awarded; and such other and

further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.


Dated; December 19, 2025                    Respectfully Submitted,

*By: /s/ Steven M. Nathan*
Steven M. Nathan (NY 2156289)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, New York 10004
(646) 357-1100
snathan@hausfeld.com

James J. Pizzirusso*
Ian J. Engdahl*
Kira Hessekiel*
**HAUSFELD LLP**
1200 17th Street, N.W., Suite 600
Washington, DC 20036
(202) 540-7200
jpizzirusso@hausfeld.com
iengdahl@hausfeld.com
khessekiel@hausfeld.com

***Attorneys for Plaintiff and the Proposed
Class***

***\*Pro Hac Vice application forthcoming***